**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **TIME WARNER CABLE INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | No. 10-2453-KHV-JPO |
| | ) | |
| **THEORYSHARE LLC, NICHOLAS AARON** | ) | |
| **DAVID and JOHN DOES 1-10,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER,
INCLUDING ASSSET FREEZE, ACCOUNTING, AND EXPEDITED DISCOVERY,
INCLUDING INSPECTION AND SEIZURE OF DEFENDANTS' BUSINESS RECORDS
AND DEFENDANTS' INVENTORY OF HACKED MODEMS**

Respectfully submitted,

DANIEL J. LEFKOWITZ, ESQ., P.C.

By /s/Daniel J. Lefkowitz
    Daniel J. Lefkowitz – Pro Hac Vice Pending
    320 New York Avenue
    Huntington, New York 11743
    (631) 692-4700– Telephone
    (631) 659-3740 – Facsimile

By  /s/Bernard J. Rhodes
    Bernard J. Rhodes    KS #15716
    LATHROP & GAGE, LLP
    2345 Grand Blvd., Ste. 2400
    Kansas City, MO  64108
    (816) 292-2000 – Telephone
    (816) 292-2001 – Facsimile

Attorneys for Plaintiff

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ADDRESSING NEED FOR EX PARTE RELIEF ....................1

ARGUMENT ...........................................................................................................................4

I.   THE SALE OR DISTRIBUTION OF HACKED MODEMS FOR
     UNAUTHORIZED RECEPTION OF HSD SERVICES VIOLATES
     17 U.S.C. § 1201 ......................................................................................................4

II.  THE DEFENDANTS' CONDUCT VIOLATES THE COMPUTER FRAUD
     AND ABUSE ACT (CFAA), 18 U.S.C. § 1030 ................................................8

     A.   Defendants' Violations of the CFAA ...................................................8

     B.   TWC's Private Right of Action Against Defendants for CFAA Violations ..........10

III. THE DEFENDANTS' CONDUCT GIVES RISE TO CLAIMS OF TWC FOR
     VIOLATIONS OF THE KANSAS UNIFORM TRADE SECRET ACT AND
     OTHER STATE CIVIL CLAIMS ........................................................................11

     A.   Kansas Uniform Trade Secret Act .....................................................11

     B.   Other State Law Claims ......................................................................13

IV.  PLAINTIFF IS ENTITLED TO A TEMPORARY RESTRAINING ORDER
     AND PRELIMINARY INJUNCTION HALTING DEFENDANTS'
     CONTINUED SALE OF HACKED MODEMS ...............................................15

     A.   Plaintiff is Entitled to a Temporary Restraining Order and a Preliminary
          Injunction under the DMCA ...............................................................15

     B.   A Temporary Restraining Order and Preliminary Injunction Should also
          Issue Upon Traditional Equitable Principles .....................................17

          1.   Likelihood of Plaintiff's Success on the Merits.........................18
          2.   Plaintiff's Irreparable Harm Absent Injunctive Relief..............18
          3.   Causation of Harm to Defendants...............................................20
          4.   The Injunction Will Serve the Public Interest............................21

V.   TWC IS ENTITLED TO AN ORDER FREEZING DEFENDANTS' ASSETS
     DURING THE PENDANCY OF THIS ACTION, AND DEFENDANTS'
     ACCOUNTING .........................................................................................................22

     A.   An Asset Freeze is Necessary to Insure that Defendants Do Not Continue
          Their Illegal Cable Piracy Business ...................................................22

i

B.      The Court has the Inherent Equitable Power to Order a Restraint on Asset Transfers in Order to Preserve the Status Quo........................................................23

C.      An Asset Restraint is Necessary to Preserve Plaintiff's Right to an Accounting and Award of Profits from the Defendants ........................................24

D.      An Asset Restraint is Necessary to Preserve Plaintiff's Right to Constructive Trust Based Upon Unjust Enrichment and Conversion ..................25

VI.     PLAINTIFF MUST HAVE EXPEDITED DISCOVERY POWER TO AVOID IRREPARABLE INJURY..................................................................................................26

VII.    TWC IS ENTITLED TO AN ORDER AUTHORIZING ENTRY UPON AND INSPECTION OF DEFENDANTS' PREMISES AND REVIEW OF BUSINESS RECORDS AND PIRATE DEVICES IN THEIR POSSESSION ...................................28

CONCLUSION.....................................................................................................................30

CC 2291045v1

## <u>TABLE OF AUTHORITIES</u>

**Cases**

Allen v. Kline,
  No. 07-2037, 2007 397368, *2 (D.Kan. Feb. 1, 2007) ........................................................... 18

Anthony v. Texaco, Inc.,
  803 F.2d 593, 1986 U.S.App. LEXIS 32255 (10th Cir. 1986) ................................................. 24

AT&T Broadband v. Tech Comms., Inc.,
  381 F.3d 1309 (11th Cir. 2004) .............................................................................. 4, 23, 25, 29

Bose BV and Bose Corporation v. Zavala,
  09-11360-GAO, 2010 U.S.Dist. LEXIS 2719 (D. Mass. 2010) ................................................. 7

Cablevision Sys. Corp. v. Muneyyirci,
  876 F.Supp. 415 (E.D.N.Y. 1994) ........................................................................................... 20

Century Home Ent., Inc. v. Laser Beat, Inc.,
  859 F.Supp. 636 (E.D.N.Y. 1994) ............................................................................................. 4

Century ML-Cable v. Carrillo Diaz,
  43 F.Supp.2d 166 (D.P.R. 1998)................................................................................. 2, 16, 21, 29

Charles Schwab & Co., Inc. v. Carter,
  No. 04 C 7071, 2005 WL 351929, *2-*3 (N.D. Ill. Feb. 11, 2005) ......................................... 11

Chem-Trol, Inc. v. Christensen,
  No. 09-2024, 2009 WL 331625, *4 (D. Kan. Feb. 10, 2009)............................................. 17, 19

Columbia Cable TV Co., Inc. v. McCary,
  954 F.Supp. 124 (D.S.C. 1996)................................................................................................... 3

Comcast of Illinois X, LLC. v. Hightech Electronics, Inc.,
  No. 03 C 3231, 2004 U.S.Dist. LEXIS 14619 (N.D.Ill. July 29, 2004) .................................... 7

Comcast of Illinois, X, LLC v. Platinum Electr., Inc.
  336 F.Supp.2d 957 (D. Neb. 2004)............................................................................................. 3

Computerland Corp. v. Batac, Inc.,
  1988 WL 140816 at *10 (S.D.N.Y. Dec. 16, 1988) ................................................................ 26

Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills,
  321 F.3d 878 n. 4 (9th Cir. 2003) ............................................................................................ 24

Cox Cable Cleveland Area v. King,
  582 F.Supp. 376 (N.D. Ohio 1983)..................................................................................... 18, 21

Coxcom Inc. v. Chaffee,
  536 F.3d 101 (1st Cir.2008)..................................................................................................... 5, 6

CSC Holdings, Inc. v. Greenleaf Electronics, Inc.,
  No. 99 C 7249, 2000 WL 715601, *6 (N.D.Ill. June 2, 2000) .............. 7, 16, 19, 21, 22, 23, 25

CSC Holdings, Inc. v. Redisi,
  309 F.3d 988 (7th Cir. 2002) ............................................................................... 22, 23, 24, 29

DeBeers Consol. Mines, Ltd. V. United States,
  325 U.S. 212 (1945)................................................................................................................. 24

Dial Info. Servs. Corp. of N.Y. v. Thornburg,
  938 F.2d 1535 (2d. Cir. 1991).................................................................................................. 17

DirecTV, Inc. v. Little,
  No. 03-2407, 2004 WL 1811153, at *6 (N.D.Cal. Aug. 12, 2004) ........................................... 6

DirecTV, Inc. v. Mars,
    No. 2004 WL 1057752, at *3 (E.D.Mich. Apr. 16, 2004 ........................................................ 6
E & A Beepers,
    43 F.Supp.2d at 1354 ........................................................................................................... 18
Echostar Satellite, L.L.C. v. Viewtech, Inc.,
    543 F.Supp.2d 1201 (S.D.Cal. 2008) ..................................................................................... 7
Federal Trade Commission v. H.N. Singer, Inc.,
    668 F.2d 1107 9th Cir. 1982) ............................................................................................... 24
Fiamb-Finanziaria Maglificio Biellese Fratelli Fila S.p.A. v. Helio Import/Export, Inc,
    601 F.Supp. 1 (S.D. Fla, 1983) ............................................................................................ 17
Fiber Systems Intern., Inc. v. Roehrs,
    470 F.3d 1150 (5th Cir. 2006) .............................................................................................. 10
Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.,
    147 F.Supp.2d 1057 (D.Kan. 2001) .......................................................................... 11, 12, 19
Freedom Electronics,
    897 F.Supp. at 1460 ........................................................................... 16, 20, 21, 27, 30
Gen. Motors Corp. v. Urban Gorilla L.L.C.,
    500 F.3d 1222 (10th Cir. 2007) ............................................................................................ 17
General Instrument Corp. v. Nu-Tek Electr.,
    197 F.3d 83 (3d Cir. 1999) .............................................................................................. 22, 23
Gonzalez, v. Pepsico, Inc.,
    489 F.Supp.2d 1233 (D.Kan. 2007) ...................................................................................... 14
Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,
    527 U.S. 308, 119 S.Ct. 1961 (1999) .................................................................................... 24
I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc.,
    307 F.Supp.2d 521 (S.D.N.Y.2004) ...................................................................................... 11
In re Vuitton et Fils, S.A.,
    606 F.2d 1 (2d Cir. 1979) ................................................................................................... 4, 28
Intermedia Partners Southeast v. QB Disrib., L.L.C.,
    999 F.Supp. 1274 (D.Minn. 1998) .......................................................................................... 3
Kindergartners Count, Inc. v. Demoulin,
    171 F.Supp.2d 1183 (D.Kan. 2001) ...................................................................................... 13
Levi Strauss & Co.,
    51 F.3d at 987 ...................................................................................................................... 24
MediaOne of Delaware, Inc. v. E & A Beepers and Cellulars,
    43 F.Supp.2d 1348 (S.D.Fla. 1998) ...................................................................................... 16
Mountain Cable Co. v. Choquette,
    53 F.Supp.2d 107 (D.Mass.1999) ......................................................................................... 29
Near v. Crivello,
    673 F.Supp.2d 1265 (D.Kan. 2009) ...................................................................................... 13
Nelson v. Nelson,
    288 Kan. 570, 205 P.2d 715 (2009) ................................................................................. 13, 26
P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore, LLC.,
    428 F.3d 504 (3d Cir. 2005) .................................................................................................. 11
Paradigm Alliance, Inc. v. Celeritas Techs., LLC,
    659 F.Supp.2d 1167 (D.Kan. 2009) ...................................................................................... 10

iv

QB Distributors,
   999 F.Supp. at 1283 ............................................................ 16, 19, 20, 21, 25, 27
Reebok Intern., Ltd. V. Marnatech Enterprises, Inc.,
   970 F.2d 552 (9th Cir. 1992) ........................................................................ 24
Regal Ware, Inc. v. Vita Craft Corp.,
   653 F.Supp.2d 1146 (D.Kan. 2006)............................................................... 14
Security Ben. Life Ins. Corp. v. Fleming Companies, Inc.,
   21 Kan.App.2d 833, 908 P.2d 1315 (Kan.App. 1995) ........................................ 14
Storer Communications, Inc. v. Mogel,
   625 F.Supp. 1194 (S.D.Fla. 1985) .............................................................. 18, 20
Sunlight Saunas, Inc. v. Sundance Sauna, Inc.,
   427 F.Supp.2d 1032 (D.Kan. 2006)................................................................ 15
Suppressed,
   109 F.Supp.2d at 903-04.......................................................................... 25, 28
Time Warner Cable of New York City v. Freedom Electr., Inc.,
   897 F.Supp. 1454 (S.D.Fla. 1995) ................................................................... 3
Time Warner Cable of New York City v. M.D. Electronics, Inc.,
   101 F.3d 278 (2d Cir. 1996)........................................................................... 25
Time Warner Cable of New York City v. U.S. Cable T.V., Inc.,
   920 F.Supp. 321 (E.D.N.Y.) ................................................................ 4, 25, 30
TKR Cable Co.,
   1996 WL 465508, *4 ................................................... 4, 16, 20, 22, 23, 25, 27
Triad Consultants, Inc. v. Wiggins,
   249 Fed.Appx 38, 2007 U.S.App. LEXIS 22226 (10th Cir. 2007) ......................... 10
Twentieth Century Fox Film Corp. v. Mow Trading Corp.,
   749 F.Supp. 473 (S.D.N.Y. 1990)............................................................... 26, 27
U.S. v. Gardner,
   860 F.2d 1391 (7th Cir. 1988) ........................................................................ 3
United States ex rel. Rahman v. Oncology Assos.,
   P.C., 198 F.3d 489 (4th Cir. 1999)................................................................... 24
Vuitton v. White,
   945 F.2d 569 (3rd Cir. 1991) ............................................................... 4, 28, 29
Worldwide Elect.,
   50 F.Supp.2d at 1291 ............................................................................... 25, 29

**Statutes**

15 U.S.C. §. 1117.......................................................................................... 25

17 U.S.C. § 1201 ......................................................... 1, 5, 6, 7, 8, 18, 19, 23

17 U.S.C. § 1202 ............................................................................................ 8

17 U.S.C. § 1203.......................................................... 1, 8, 16, 17, 24, 26, 28

18 U.S.C. § 1029.......................................................................................... 10

18 U.S.C. § 1030.............................................. 1, 8, 9, 10, 11, 12, 16, 18, 19

CC 2291045v1

K.S.A. § 60-3321 ................................................................................................... 16, 18

K.S.A. § 60-3320 .................................................................... 1, 12, 13, 16, 19, 24, 27

K.S.A. § 60-3322 ......................................................................................................... 1, 23

**Other Authorities**

Restatement of Restitution: <u>Quasi Contracts and Constructive Trusts</u>, § 160 (1936) .................. 28

**Rules**

Fed.R.Civ.P. 30 ................................................................................................................. 1, 28

Fed.R.Civ.P. 34 ...................................................................................................................... 30

Fed.R.Civ.P. 64 ................................................................................................................ 1, 30

Fed.R.Civ.P. 65 ......................................................................................................... 1, 16, 25, 30

CC 2291045v1

Plaintiff Time Warner Cable Inc. ("TWC") respectfully submits this Memorandum of Law in support in support of its ex parte motion for relief against the defendants.  TWC has brought this action pursuant to the Digital Millennium Copyright Act ("DMCA") 17 U.S.C. § 1201, The Computer Fraud and Abuse Act ("CPAA") 18 U.S.C. § 1030, Kansas Trade Secrets Act K.S.A. 60-3320 et. seq., and applicable Kansas state law for injunctive relief and monetary damages based on defendants' statutorily prohibited manufacture, sale and/or distribution of hacked broadband modems for use on cable systems to obtain high-speed data ("HSD") service without payment or authorization.

TWC seeks a temporary restraining order and preliminary injunction pursuant to Fed.R.Civ.P. 65, 17 U.S.C. § 1203 (b)(1), 18 U.S.C. § 1030 (g), and K.S.A. 60-3322; an Order freezing defendants' assets and gains from their hacked modem sales pursuant to Fed.R.Civ.P. 64 and 65 and 17 U.S.C. § 1203 (c)(2); an Order of expedited discovery pursuant to Fed.R.Civ.P. 30(a), 33, 34, 36, and 45; and an Order of seizure of their inventory of hacked modems and business records and computers pursuant to Fed.R.Civ.P. 64 and 65 and 17 U.S.C.§ 1203 (b)(2).

### Preliminary Statement Addressing Need for Ex Parte Relief

TWC has sued the defendants, who are distributors of "hacked modems" and related products.  A hacked modem is a device intended to break and enter into an HSD system and deceive the provider's security software into allowing access to the HSD service without payment.  Although, as a result of evolving technology, this type of illegal activity is fairly new, nevertheless, the sale of similar devices has been the subject of two federal criminal charges. Lefkowitz Affidavit (hereinafter "Lefkowitz Aff.) Exhibits A and B.[1]

---

[1]     Reference is made to the Affidavit of Daniel J. Lefkowitz sworn to on August 11, 2010 ("Lefkowitz Aff."), the Affidavit of Lo Cheung sworn to on August 10, 2010 ("Cheung Aff."), and the Affidavit of Travis Babcock sworn to on August 10, 2010 ("Babcock Aff."), and the exhibits thereto, for a complete recitation of defendants' conduct and its impact on plaintiff.

Moreover, defendants' "cloning" scheme is not a new concept.  Century ML-Cable v. Carrillo Diaz, 43 F.Supp.2d 166, 171 (D.P.R. 1998) addressed a similar access code cloning scheme, in which the defendants cloned the identification information for a legitimate cable television decoding device used by a paying subscriber, and then sold other cable descrambling devices with the cloned information.  As those devices were "seen" by the cable company's computer as being the legitimate device, it authorized them to receive all services that the legitimate device was authorized to receive.  In Carrillo, the court had no trouble entering a TRO of the type sought herein against the defendants.

Similarly, in this case, defendants equip their hacked modems with software which facilitates theft by enabling "cloning" of the identifiers of a legitimate TWC HSD customer account.  Cheung Aff. ¶ 15. The hacked modems act to circumvent TWC's security access controls, which prevent unauthorized access, and which are comprised of hardware and software, much of which is protected by patents and copyright.  Users of hacked modems operate on the HSD system anonymously, using HSD service, such as email and Internet searches, impersonating an authorized TWC customer.  Hacked modems cause loss of revenue, can create service outages, and consume time of engineering and technical staff.  Cheung Aff. ¶ 18.

As more fully described in the Complaint (¶¶ 8-25) and in the Cheung Affidavit, hacked modems represent a threat to HSD service providers as well as law enforcement because the user of a hacked modem is able to access free HSD service by impersonating an authorized user, making the hacker's identity difficult to determine.

As has long been the case with similar enterprises involving piracy of the cable television industry, these defendants' business is conducted with full knowledge that it deprives HSD service providers of revenues.  Defendants' operation bears hallmarks of an illegal infringement-

CC 2291045v1

type business, such as (i) their use of disclaimers of liability for theft of services (see Exhibit F)

by purchasers of their equipment and (ii) the tutorials they offer, including the "Quick and Dirty

BPI" tutorial that instructs hackers to avoid Baseline Privacy interface – a sophisticated form of

encrypted security used by TWC precisely to prevent unauthorized access to its HSD service.

Use of disclaimers and instructions for avoiding another company's security measures are very

unorthodox practices for a retail business selling legal products, but a common practice in a

piracy operation.[2]  See, Cheung Aff. ¶ 21 (hacked modems serve no feasible lawful purpose).

TWC submits that, unless this Court grants its request for ex parte relief, it will suffer

immediate and irreparable harm.  Hacked modems are capable of accessing TWC's secure

computers and networks, bypassing security software, removing and exploiting copyrighted

configuration files and IP addresses, and receiving service without payment while impersonating

an authorized user.  The HSD service offers, among other things, access to copyrighted works on

the Internet.  It is difficult and time-consuming to detect the use of a hacked modem and virtually

impossible to identify the hacker.  Indeed, with each day that defendants operate their illegal

business, and with each cloned modem they distribute to a potential TWC customer, TWC

suffers immediate and ongoing economic harm and damage to its HSD system.

The ex parte relief sought seeks to immediately stop defendants' illegal operation while

preserving the records of sales which represent the only hope of uncovering users of hacked

---

[2]        Every reported decision regarding "disclaimers" used in sales of cable theft devices holds that they don't shield sellers from liability.  See, e.g., Comcast of Illinois, X, LLC v. Platinum Electr., Inc. 336 F.Supp.2d 957, 964 (D. Neb. 2004); Intermedia Partners Southeast v. QB Disrib., L.L.C., 999 F.Supp. 1274, 1282 (D.Minn. 1998); Time Warner Cable of New York City v. Freedom Electr., Inc., 897 F.Supp. 1454, 1459 (S.D.Fla. 1995). Indeed, many courts find that such disclaimers reflect a cable pirate's awareness of the illegality of its conduct.  See U.S. v. Gardner, 860 F.2d 1391, 1396 (7th Cir. 1988) ("Whatever the attempted legal effect of the defendant's disclaimer, the ultimate trier of fact could easily find that **it was a transparent attempt to deny the patent illegality of the defendant's acts**…" (emphasis added); Platinum Electr., 336 F.Supp.2d at 964; Columbia Cable TV Co., Inc. v. McCary, 954 F.Supp. 124, 127 (D.S.C. 1996) ("This court does not find that the disclaimer negates any intent to assist others in the unauthorized access of cable programming.  **In fact, the court finds that the disclaimer demonstrates knowledge of the most probably if not only use of the devices**") (emphasis added).

modems.  As discussed herein, absent a grant of the relief requested, persons selling similar

cable-based theft devices, upon receiving notice of imminent steps to be taken against them,

almost uniformly act promptly to secrete and/or destroy all illegal devices, records of previous

sales, including computerized records, and all other items evidencing their criminal conduct.

Consequently, TWC seeks the Court's grant on an ex parte basis of extraordinary

preliminary relief of a type commonly granted to aggrieved cable operators and copyright

holders, in order to preserve the status quo of existing evidence, hacked modem inventory and

illicit profits.[3]  This relief will prevent ongoing illegal conduct during the pendency of this case,

preserve the status quo of existing evidence, and enable TWC to avail itself of its statutory and

equitable remedies.  As discussed at length herein, numerous federal courts, recognizing that the

relief sought in cable-based theft device operations is crucial to preserve the status quo, have

repeatedly granted relief identical to that sought by TWC herein.

## ARGUMENT

I.   **THE SALE OR DISTRIBUTION OF HACKED MODEMS FOR
     UNAUTHORIZED RECEPTION OF HSD SERVICES VIOLATES
     17 U.S.C. § 1201**

Count I of the Complaint sets forth a violation of the Digital Millennium Copyright Act

(DMCA), 17 U.S.C. § 1201.  TWC alleges direct and indirect circumvention of a system

controlling access to copyrighted works in violation of § 1201(a)(1), trafficking in technology

---

[3]      See e.g., AT&T Broadband v. Tech Comms., Inc., 381 F.3d 1309, 1315-1321 (11th Cir. 2004)
(upholding ex parte grant of asset freeze and seizure); TKR Cable Co., 1996 WL 465508, *4  (granting cable
company's ex parte motion for, inter alia, seizure, asset freeze and expedited discovery, stating "The Court's review
of the plaintiff's application indicated that the plaintiff had made out a prima facie case for the award of such relief,
and that the need for each aspect of the relief sought therein, and its grant to the plaintiff on an ex parte basis, was
clear"); Time Warner Cable of New York City v. U.S. Cable T.V., Inc., 920 F.Supp. 321, 324-5 (E.D.N.Y.)
(granting two similar ex parte orders against pirate decoder sellers in two month period); see also Vuitton v. White,
945 F.2d 569, 571-2 (3rd Cir. 1991) (acknowledging that temporary restraining orders issued with notice are
frequently ignored, and holding that denial of ex parte seizure request was abuse of discretion), citing In re Vuitton
et Fils, S.A., 606 F.2d 1 (2d Cir. 1979); Century Home Ent., Inc. v. Laser Beat, Inc., 859 F.Supp. 636, 638-9
(E.D.N.Y. 1994) ("Furthermore, Plaintiff need not show that a particular Defendant would not adhere to a TRO but
rather only that someone like Defendant would be likely to hide or destroy the evidence of his infringing activity").

CC 2291045v1

designed to circumvent a system controlling access to copyrighted works in violation of §

1201(a)(2) and trafficking in technology designed to circumvent the protection of one or more

rights of a copyrighted work in violation of § 1201(b).

　　　　To establish liability under the DMCA, a plaintiff must establish two elements:

"(1) defendant trafficked in a technology; and (2) the technology was primarily designed or

produced to circumvent conditional access controls to protected works, or has limited

commercially significant use other than such circumvention."  <u>Coxcom Inc. v. Chaffee</u>, 536 F.3d

101, 110 (1st Cir. 2008).  "To 'circumvent a technological measure' means to descramble a

scrambled work, to decrypt an encrypted work, or <u>otherwise to avoid, bypass, remove,</u>

<u>deactivate, or impair a technological measure</u>, without the authority of the copyright owner . . . ."

<u>17 U.S.C. § 1201(a)(3)(A)</u> (emphasis supplied).

　　　　As is set forth in the Cheung Aff., when a hacked modem presents itself for access to

TWC's HSD system, it shows fraudulent identifiers which communicate with TWC's proprietary

customer authentication software.  By circumventing TWC's system security functions, and by

fraudulently presenting an authorized customer's Media Access Control ("MAC") address, the

hacked modem is able to trick TWC's servers into issuing a proprietary DOCSIS configuration

file.  This configuration file incorporates copyrighted instructions created by TWC employees

and owned by TWC; such instructions, along with accompanying proprietary data, are intended

to provision a modem for, among other things, the level of service it is authorized to receive.

When it receives a configuration file, the hacked modem stores it, executes the instructions and

data contained in the file and communicates back to TWC's server a confirmation that the IP

address and the configuration file has been received, and that it is on-line and ready for use.  In

this way, the TWC authentication process is deceived into allowing the hacked modem user

access to the configuration file, the HSD service and its content.

The hacked modem meets all three tests for liability under § 1201(a)(2):

1)      The hacked modem is primarily designed or produced for the purpose of
        circumventing MAC authentication security;

2)      The hacked modem has no commercially significant purpose other than MAC
        spoofing; and

3)      Theoryshare markets the hacked modem for use in circumventing the MAC
        authentication security.

See, § 1201(a)(2)(A), (B) and (C).

Significantly, the MAC authentication process controls access to a legitimate customer's

copyright protected configuration file.  The use of a "cloned" MAC address circumvents TWC's

access controls to a configuration file.  Only after a configuration file is received, copied and

used can a customer obtain HSD service.  In essence, the goal of a hacker is to obtain a copy of a

(copyrighted) configuration file (intended only for an authorized customer) because once copied

the configuration file gives access to HSD service and the opportunity to access copyrighted

work available on the Internet.

The DMCA has repeatedly been applied in actions against persons assisting in the

interception of copyright protected services offered over a cable system or via satellite.  See

CoxCom v. Chaffee, 536 F.3d at 101 (DMCA applied to defendants' sale of filter designed to

block cable company's billing commands transmitted via two-way communication over its cable

system); DirecTV, Inc. v. Little, No. 03-2407, 2004 WL 1811153, at *6 (N.D.Cal. Aug. 12,

2004); DirecTV, Inc. v. Mars, No. 2004 WL 1057752, at *3 (E.D.Mich. Apr. 16, 2004)

(proposed amendment to to add DMCA claim to Communications Act claim against alleged

reseller of pirate signal theft equipment would not be futile); CSC Holdings, Inc. v. Greenleaf

6

Electronics, Inc., No. 99 C 7249, 2000 WL 715601, *6 (N.D.Ill. June 2, 2000) (cable company

was person injured by defendants' sale of modified cable converters used to circumvent its

technological measures preventing access to copyrighted programming offered to customers).

In Comcast of Illinois X, LLC. v. Hightech Electronics, Inc., No. 03 C 3231, 2004

U.S.Dist. LEXIS 14619 (N.D.Ill. July 29, 2004), the Northern District of Illinois reached the

same result it had previously reached in Greenleaf Electronics, relying on the following analysis,

equally applicable to TWC in the present case:

> Comcast is indisputably not the copyright holder of the programs on the networks
> which it provides to its subscribers.  However, those programs are copyrighted
> material, and Comcast controls access to such protected material through the
> descrambling method described in its complaint.  Similarly, under 17 U.S.C. §
> 1201 (b)(1), although the "controlled access" language of 17 U.S.C. § 1201 (a)(2)
> is not stated, a violation of the statute also occurs when a technological measure
> that effectively protects the right of a copyright owner is circumvented.  Comcast
> does control the technological measure that protects the copyrighted material.
> Moreover, pursuant to 17 U.S.C. § 1203 (a) "any person injured by a violation of
> section 1201 or 1202 may bring a civil action in an appropriate United States
> district court for such violation."  The civil remedies provided in the statute do not
> explicitly state that recovery is limited to the copyright holder.  Therefore, as
> Comcast controls access to copyrighted material and is a person injured from a
> violation of 17 U.S.C. § 1201, we conclude that it can bring suit pursuant to the
> DMCA.

Id. at *6.  See also, Echostar Satellite, L.L.C. v. Viewtech, Inc., 543 F.Supp.2d 1201, 1205

(S.D.Cal. 2008); Bose BV and Bose Corporation v. Zavala, 09-11360-GAO, 2010 U.S.Dist.

LEXIS 2719 (D. Mass. 2010).

TWC submits that when 17 U.S.C. § 1201 and relevant case law are applied to the facts

established by the supporting Affidavits, it is clear that defendants' conduct has violated and

continues to violate the DMCA.

II.     **THE DEFENDANTS' CONDUCT VIOLATES THE COMPUTER FRAUD AND ABUSE ACT (CFAA), 18 U.S.C. § 1030**

A.      <u>Defendants' Violations of the CFAA</u>

18 U.S.C. § 1030, the Computer Fraud and Abuse Act, is directed at the precise conduct at issue herein, <u>i.e.</u>, obtaining unauthorized access to protected computers.  It provides, in pertinent part, the following:

(a) Whoever --

      *         *         *         *

(4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period;

      *         *         *         *

(6) knowingly and with intent to defraud traffics (as defined in section 1029) in any password or similar information through which a computer may be accessed without authorization, if--

(A) such trafficking affects interstate or foreign commerce; or

      *         *         *         *

. . . shall be punished as provided in subsection (c) of this section.

"Protected computer system," is defined by 18 U.S.C. § 1030 (e)(2)(B) as meaning a computer "which is used in or affecting interstate or foreign commerce or communication . . ." As reflected in the Cheung Aff. ¶ 4, TWC's computers utilized for its HSD service collectively provide, route, transmit and otherwise disseminate its HSD service and enable authorized, paying users to communicate with persons and access web information throughout the United States and the entire world.  Thus, they indisputably are used in and affect interstate and foreign commerce.

18 U.S.C. § 1030(e)(8) defines damage as "…any impairment to the integrity or availability of data, a program, a system or information."  As discussed in the Cheung Aff. ¶¶11-12, a hacked modem, whether sold by defendants or the creation of which is facilitated by defendants' provision of software, instructions and other technical support and assistance, triggers the issuance of a leased IP address and a configuration file to the hacker's computer or gateway.  The issuance of an IP address reduces the availability of public IP addresses for authorized customers of TWC.  These IP addresses cost TWC money.  Moreover, the process by which a hacked modem breaks into TWC's computer system and accesses services both (i) impairs the integrity of TWC's system; and (ii) removes both IP addresses and configuration files from TWC's inventory, resulting in impairment to availability of data and expense to TWC.  Cheung Aff. ¶¶ 11-12.

In its complaint, TWC has asserted claims for violation of Section 1030 (a)(4) and (a)(6).  Complaint Count II.  With respect to the subsection (a)(6) trafficking violation,[4] the Babcock Aff. demonstrates that defendants, by offering hacked modems, downloads, and online tutorials directed at enabling unauthorized access to TWC's HSD services, and circumventing TWC's access control and anti-theft countermeasures, are clearly trafficking in "passwords or similar information through which a computer can be accessed without authorization" knowingly, and with the intent to defraud HSD providers such as TWC.  The sole commercially significant purpose of defendants' products is to enable access to HSD service without payment or authorization.  Cheung Aff. ¶ 21.

---

[4]       Section 1030 (a)(6) takes its definition of "traffic" from 18 U.S.C. § 1029 (e)(5), which provides "(5) the term 'traffic' means transfer, or otherwise dispose of, to another, or obtain control of with intent to transfer or dispose of."

Similarly, with respect to the primary element of intentional access in violation of subsection (a)(4), the facts described in the Cheung and Babcock affidavits submitted in support of TWC's Motion demonstrate that defendants, together with their customers, act in tandem to gain access to TWC's HSD service, and the computers that operate it. This access is completely without authorization from TWC and, indeed, in spite of TWC's efforts to protect its system and computers from precisely this type of unauthorized access.

**B.    TWC's Private Right of Action Against Defendants for CFAA Violations**

Although located in Title 18 and primarily a criminal statute, 18 U.S.C. § 1030(g) does provide a private civil right of action for violations of the statute. The Tenth Circuit set forth the parameters of civil liability under Section 1030(a)(4) discussed above in Triad Consultants, Inc. v. Wiggins, 249 Fed.Appx 38, 2007 U.S.App. LEXIS 22226 (10th Cir. 2007), stating:

> …under the portions of 18 U.S.C. § 1030 relevant to Triad's CFAA claim, whoever "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value" may be liable in a civil action to any person who as a result suffers "loss to 1 or more persons during any 1-year period … aggregating at least $5,000 in value." 18 U.S.C. § 1030(a)(4), (a)(5)(B)(I), (g).

Id., 249 Fed.Appx. at 39, 2007 U.S.App.LEXIS 22226.  See, also, Paradigm Alliance, Inc. v. Celeritas Techs., LLC, 659 F.Supp.2d 1167, 1192 (D.Kan. 2009) (discussing private right of action under CFAA).  As discussed at length in Paradigm Alliance, 659 F.Supp.2d at 1190-91, the private right of action exists for any violation of Section 1030, so long as the violation involves one of the factors listed in Section 1030(c)(4)(A)(i);[5] see also Fiber Systems Intern., Inc. v. Roehrs, 470 F.3d 1150, 1156-57 (5th Cir. 2006); P.C. Yonkers, Inc. v. Celebrations the

---

[5]        As noted in Paradigm Alliance, 659 F.Supp.2d at 1190, n. 72, in 2008, Congress amended Section 1030 which, in addition to substantive changes, resulted in renumbering and resequencing its subparagraphs.  As stated in note 72, the Paradigm Alliance court (and the Tenth Circuit in Triad Consultants, decided in 2007), was addressing the prior version of the statute, in which these provisions were then set forth in Section 1030 (a)(5)(B).

Party and Seasonal Superstore, LLC., 428 F.3d 504, 511-13 (3d Cir. 2005); Charles Schwab &

Co., Inc. v. Carter, No. 04 C 7071, 2005 WL 351929, *2-*3 (N.D. Ill. Feb. 11, 2005); I.M.S.

Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc., 307 F.Supp.2d 521, 526 (S.D.N.Y.2004)

("Section 1030(g) affords a civil action for any CFAA violation").

Among the factors set forth in subsection (c)(4)(A)(i) is "(I) loss to one or more persons

during any 1-year period . . . aggregating at least $5,000 in value."  Section 1030(e)(11) defines

"loss" as "any reasonable cost to any victim, including the cost of responding to an offense,

conducting a damage assessment, and restoring the data, program, system, or information to its

condition prior to the offense . . . "  TWC has suffered losses from defendants' violations of

Section 1030 (a)(4) and (a)(6).  These losses, as defined in the Cheung Aff ¶¶ 11, 12 and 18, not

only results from reduction of revenue, but also from TWC's very significant costs of responding

to issues presented by multiple MAC addresses, engineering fixes, field technicians, and outages

caused by hacked modems, which costs exceed $5,000.00 from in a one-year period resulting

from the defendants' conduct alone.  Complaint ¶ 45. Given these losses, TWC can demonstrate

that defendants' violations satisfy the first of Section 1030(c)(4)(A)(i)'s factors, and thus it has

standing to assert civil claims against them under the subsections (a)(4) and (a)(6) of the CFAA.

**III.  THE DEFENDANTS' CONDUCT GIVES RISE TO CLAIMS OF TWC FOR VIOLATIONS OF THE KANSAS UNIFORM TRADE SECRET ACT AND OTHER STATE CIVIL CLAIMS**

**A.     Kansas Uniform Trade Secret Act**

In Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc., 147 F.Supp.2d 1057, 1065

(D.Kan. 2001), this Court noted that the threshold inquiry for a trade secret claim is whether or

not such a secret exists.  According to K.S.A. § 60-3320(4), "trade secret" means "information,

including a formula, pattern, compilation, program, device, method, technique, or process, that

… (i) derives independent economic value, actual or potential, from not being generally known

to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use."  TWC's IP addresses, access information, binary files and configuration files clearly fall within this definition.  As reflected in the Complaint ¶¶ 60-61, they are formulas, patterns, or programs necessary to enable use of TWC's HSD services; they are not readily known or readily ascertainable by those in the industry, including TWC's customers; and as gatekeepers of TWC's service, have independent economic value derived from not being generally known.

Given that TWC's information discussed above is a trade secret, the next inquiry is whether it has been misappropriated.  Fireworks Spectacular, 147 F.Supp.2d at 1067. "Misappropriation" is defined in K.S.A. § 60-3320(2) as "(i) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; **or** (ii) disclosure or use of a trade secret of another without express or implied consent by a person who . . . (A) used improper means to acquire knowledge of the trade secret." (emphasis added).  Defendants' conduct closely fits either aspect of the misappropriation definition.  With respect to K.S.A. § 60-3320(2)(i), defendants acquired TWC's trade secrets, in the form of IP addresses, binary files and configuration files.  As defendants undertook this conduct themselves, and their products are designed to avoid TWC's security measures, they unquestionably knew that TWC's trade secrets were acquired by improper means.  Similarly, with respect to K.S.A. § 60-3320(2)(ii), defendants' hacked modems assisted their customers in obtaining unauthorized disclosure of TWC's trade secrets, in order for the customers to achieve their goal (mutual with defendants) of receiving TWC's HSD service without payment.

### B.      Other State Law Claims

TWC has also pleaded other supplemental claims under Kansas law against the

defendants, i.e., unjust enrichment, conversion, trespass to computer, and tortious interference

with contract.  Complaint ¶¶ 53 - 69.[6]  They are based largely on the same facts as TWC's

federal claims.  Under Kansas law, conversion is defined "as the unauthorized assumption or

exercise of the right of ownership over goods or personal chattels belonging to another to the

exclusion of the other's rights."  Kindergartners Count, Inc. v. Demoulin, 171 F.Supp.2d 1183,

1192 (D.Kan. 2001).  Intangible property rights can be the subject of conversion, so long as a

present property interest exists.  Near v. Crivello, 673 F.Supp.2d 1265, 1281 (D.Kan. 2009).

In this case, defendants distributed hacked modems and related software to enable

unauthorized access to TWC's property, including its particular configuration files pertaining to

the hacked modem, and IP addresses leased by TWC for a charge and assigned to particular

users.  Once the unique configuration files and IP addresses are provided by TWC's computer to

hacked modem users, they are no longer available for use by TWC, and they enable the further

theft of TWC's HSD service.  Complaint ¶ 15.  This amounts to a clear case of conversion of

TWC's IP addresses, configuration files and, ultimately, its HSD service.  In a similar manner,

defendants facilitate their customers' trespassing on TWC's computers through obtaining the IP

addresses and configuration files that grant unauthorized access to, and use of, the computers.

TWC's unjust enrichment claim, based on relatively similar concepts, satisfies the

required three elements under Kansas law: "(1) a benefit conferred upon the defendant by the

---

[6]      Notably, in Nelson v. Nelson, 288 Kan. 570, 579-80, 205 P.2d 715, 723-24 (2009), the Supreme Court of Kansas confirmed that there was no independent civil claim for a constructive trust.  Instead, it was a remedy to be used in conjunction with another claim in the nature of unjust enrichment or otherwise involving a duty to convey property to one to whom it justly belongs, such as conversion, misuse or misappropriation of information, or infringement of copyright.  Accordingly, TWC has pleaded for imposition of a constructive trust in its Complaint not as an independent claim, but as relief requested under its unjust enrichment and conversion claims.

plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the

acceptance or retention by the defendant of the benefit under such circumstances as to make it

inequitable for the defendant to retain the benefit without payment of its value." Regal Ware,

Inc. v. Vita Craft Corp., 653 F.Supp.2d 1146, 1151 (D.Kan. 2006).  A contract or other meeting

of the minds is not required for unjust enrichment claims, Gonzalez, v. Pepsico, Inc., 489

F.Supp.2d 1233, 1249 (D.Kan. 2007); Security Ben. Life Ins. Corp. v. Fleming Companies, Inc.,

21 Kan.App.2d 833, 842-43, 908 P.2d 1315, 1322-23 (Kan.App. 1995), nor does the benefit have

to be conferred directly or knowingly by the plaintiff upon the defendant.  Gonzalez, 489

F.Supp.2d at 1249; Sec. Ben. Life Ins., 21 Kan.App.2d at 843, 908 P.2d at 1323.

    In this case, the benefit to defendants is their making money by helping customers steal

TWC's HSD service.  TWC customers are, in effect, paying defendants in lieu of TWC.

Defendants' revenues represent money due to TWC.  The benefit is also conferred upon

defendants' presently unknown co-conspirators and joint tortfeasors, i.e., the hacked modem

purchasers and software users who obtain TWC's IP addresses and configuration files, and use

them to get TWC's HSD service without payment or authorization.  As discussed in Sections IV

and V herein, the injunctive relief sought in the present motion is directed, in part, at identifying

those persons.  Defendants clearly know of the benefit they receive, as they sell devices designed

to steal HSD service, and make money every time a customer purchases a theft device from them

to avoid paying TWC.  Defendants' retention of the benefit (their revenues), resulting from

essentially a de-facto one-time "licensing fee" their customers pay them to obtain the ability to

steal TWC's HSD service, is manifestly inequitable without payment of its value over to TWC.

    TWC's complaint and affidavits also satisfy the required elements of a tortious

interference with contract claim, i.e., (1) a contract; (2) the wrongdoer's knowledge thereof;

(3) intentional procurement of its breach; (4) absence of justification; and (5) damages resulting therefrom.  Sunlight Saunas, Inc. v. Sundance Sauna, Inc., 427 F.Supp.2d 1032, 1070 (D.Kan. 2006).  TWC has contractual relationships with customers to receive its cable television and/or internet-based telephone service carried over its cable system, as is its HSD service.  The existence of such contracts is a matter of common knowledge, and certainly one that defendants, given their business model, know or should know.  According to the contracts' express terms, obtaining unpaid access to any TWC services, including HSD service – the identical conduct procured by defendants -- amounts to a breach of such contracts.  Defendants lack any justification for interfering with such contracts, and TWC clearly suffers damages as a result.

## IV.   PLAINTIFF IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION HALTING DEFENDANTS' CONTINUED SALE OF HACKED MODEMS

TWC seeks a temporary restraining order and preliminary injunction directed against defendants' continued manufacture, sale or distribution, of hacked modems pursuant to 17 U.S.C. § 1203 (b)(1), 18 U.S.C. § 1030(g), K.S.A. 30-3320, et. seq., or in the alternative, Fed.R.Civ.P. 65.

### A.   Plaintiff is Entitled to a Temporary Restraining Order and a Preliminary Injunction under the DMCA

The DMCA contains specific language authorizing issuance of temporary and permanent injunctions:

> (b) Powers of the court. -- In an action brought under subsection (a), the court –
> (1) may grant temporary and permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation…

17 U.S.C. § 1203 (b)(1).  Similarly, 18 U.S.C. § 1030 provides that "Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief."  K.S.A.

15

§ 60-3321 (a) provides that "Actual or threatened misappropriation may be enjoined." being the same as the legitimate device, it authorized receipt of service by all of them.

Numerous Federal courts have held in cases involving theft of services offered over a cable system, when express authority for issuance of "statutory" injunction is provided by statute, an injunction, including the ordering of an asset freeze, may issue without resort to the traditional "equitable" prerequisites of such relief.  See Century v. Carrillo, 43 F.Supp.2d at 171 (D.P.R. 1998) (preliminary injunctive relief identical to that sought herein was granted to prevent a similar cloning scheme); QB Distributors, 999 F.Supp. at 1283; MediaOne of Delaware, Inc. v. E & A Beepers and Cellulars, 43 F.Supp.2d 1348, 1353 (S.D.Fla. 1998); Freedom Electronics, 897 F.Supp. at 1460; TKR Cable Co. 1996 WL 465508 at *10-*12.

In one such case, Greenleaf Electronics, 2000 WL 715601 at *7, the court expressly noted that, although it granted the preliminary injunction on equitable grounds, a statutory injunction under 17 U.S.C. § 1203 (b)(1) was also proper, given plaintiffs' showing a reasonable likelihood of future violations of the DMCA absent the injunction.

The affidavits of TWC investigator Travis Babcock and Manager of Systems Operations Lo Cheung establish collectively that the defendants engaged in the illegal sale of cloned modems for the purpose of gaining unauthorized access to TWC's HSD services, its computers,

16

and its copyrighted materials protected by a technological measure. [7]   This is the precise conduct

that the DMCA and the CFAA in particular mandates be enjoined by injunctions issued by

district courts under 17 U.S.C. § 1201 (b)(1) and 18 U.S.C. § 1030 (g).  See also K.S.A. § 60-

3321(a) (authorizing court to grant injunctions in trade secret actions).  As such, the Court's

issuance of a statutory injunction herein is appropriate.

> **B.**     **A Temporary Restraining Order and Preliminary Injunction Should also Issue Upon Traditional Equitable Principles**

In the Tenth Circuit, to obtain preliminary injunctive relief, a plaintiff bears the burden of

demonstrating (1) a substantial likelihood of success on the merits; (2) irreparable harm to the

movant if the injunction is denied; (3) the threatened injury outweighs whatever harm the

preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not

adversely affect the public interest.  Gen. Motors Corp. v. Urban Gorilla L.L.C., 500 F.3d 1222,

1226 (10th Cir. 2007); Chem-Trol, Inc. v. Christensen, No. 09-2024, 2009 WL 331625, *4 (D.

Kan. Feb. 10, 2009).  The standard for seeking a temporary restraining order is identical, but the

moving party must also show that the relief sought is necessary to preserve the status quo and

---

[7]        It is well-established in that, in the context of a temporary restraining order application and/or a preliminary injunction proceeding, a court may properly consider, and grant relief based upon, affidavits and other evidence that might not be admissible at trial.  See e.g. Pharmanex, Inc. v. HPF, 221 F.3d 1352, 2000 WL 703164, *3 (10th Cir.2000) (unpublished opinion)(citing J. Moore, Moore's Federal Practice § 65.23 (1999)); Levi Strauss & Co. v. Sunrise Intern. Trading Inc., 51 F.3d 982, 985 (11th Cir. 1995) ("At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunction proceeding.") (citations omitted); Sierra Club, Lone Star Chapter v. FDIC, 992 F.2d 545 (5th Cir. 1993) ("[A]t the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely upon otherwise inadmissible evidence, including hearsay evidence.  Thus, the district court can accept evidence in the form of deposition transcripts and affidavits").  Numerous other federal courts agree, including a district court in a case involving cable television piracy.  Greenleaf Electronics, 2000 WL 715601 at *6.

[9]        In other intellectual property piracy cases, see e.g. Fiamb-Finanziaria Maglificio Biellese Fratelli Fila S.p.A. v. Helio Import/Export, Inc, 601 F.Supp. 1, 3 (S.D. Fla, 1983) ("Expedited discovery should be granted when some unusual circumstances or conditions exist that would likely prejudice the party if he were required to wait the normal time.") (citations omitted); Computerland Corp. v. Batac, Inc., 88 Civ. 8624, 1988 WL 140816, *10 (S.D.N.Y. Dec. 16, 1988) (expedited discovery of defendants' assets granted in conversion case); Dial Info. Servs. Corp. of N.Y. v. Thornburg, 938 F.2d 1535, 1539 (2d. Cir. 1991) ( noting that expedited discovery preceded preliminary injunction hearing).

prevent immediate irreparable harm.  <u>Allen v. Kline</u>, No. 07-2037, 2007 397368, *2 (D.Kan. Feb. 1, 2007).  As more fully discussed below, TWC's submissions herein fully satisfy each of the components of the Tenth Circuit test.

### 1.    Likelihood of Plaintiff's Success on the Merits

TWC submits that its prior discussion herein of the illegality of defendants' actions under 17 U.S.C. § 1201 under Point I., <u>supra</u>, and 18 U.S.C. 1030 under Point II, <u>supra</u>, as well as K.S.A. 60-3320, et. seq., and the facts set forth in its supporting Affidavits, clearly demonstrate TWC's great likelihood of success on the merits.  Its Complaint alleges defendants' repeated, intentional and ongoing violations of the DMCA and CFAA evidenced by its investigation.

### 2.    Plaintiff's Irreparable Harm Absent Injunctive Relief

The nature and degree of irreparable harm caused to telecommunications companies by devices allowing theft of their services is well-established.  In <u>Storer Communications, Inc. v. Mogel</u>, 625 F.Supp. 1194 (S.D.Fla. 1985), the court noted that when a clear violation of a plaintiff's statutory rights has been shown, the necessity of showing irreparable harm is virtually eliminated, <u>id.</u> at 1201.  It found that cable companies suffered irreparable harm from the sale of devices permitting unauthorized interception of those services and held:   "Defendant's conduct causes irreparable harm because Plaintiff's ability to retain existing subscribers, to enlist new subscribers, to acquire suitable programming and to remain in the cable business depend directly on their reputation as the sole source of the cable programming that Plaintiff provides." <u>Id.</u>; <u>see also</u> <u>Cox Cable Cleveland Area v. King</u>, 582 F.Supp. 376, 381 (N.D. Ohio 1983) (finding that "The continued viability of Cox's business depend upon the willingness of subscribers to pay a subscription fee for the premium programming.  If equipment necessary to receive, convert, and decode Cox's scrambled signals can be purchased from defendants without payment to Cox, the public will no longer see any advantage in paying Cox."); <u>E & A Beepers</u>, 43 F.Supp.2d at 1354.

18

This Court has similarly held that loss of customers, goodwill and threats to a business's viability can constitute irreparable harm.  <u>Chem-Trol</u>, 2009 WL 331625 at *4; <u>Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.</u>, 86 F.Supp.2d 1102, 1108 (D.Kan. 2000) ("plaintiffs have successfully shown that, if Mr. Sutcliffe is not enjoined from breaching the covenant not to compete, they will suffer irreparable harm. Mr. Sutcliffe is engaging in behavior that is likely to result in plaintiffs' further loss of customers as well as customer goodwill.  The court determines that such activity is causing irreparable harm because of the 'extreme difficulty and uncertainty in restoring goodwill among the customers and regaining the business of customers who are being, and will be, induced away or lost by the plaintiff.'").

Moreover, TWC in most cases has no practical method of discovering unauthorized reception of its HSD services, theft of MAC addresses and configuration files, and circumvention of its technological measures meant to control access to copyrighted materials by use of cloned modems and the other products defendants offer.  <u>See</u> Cheung Aff. ¶ 18.  In <u>Greenleaf Electronics</u>, 2000 WL 715601, at *6, a case brought under the DCMA, the court found that the defendants' sale of theft devices caused irreparable harm in the form of lost revenue and customers, which the plaintiff cable company was not practically able to detect and eliminate, as well as a loss of goodwill with respect to existing customers.  The court further found that there was no adequate remedy at law, and that without a temporary injunction, there could be no guarantee that the defendants would not continue to violate the statutes, including the DMCA. <u>Id.</u> at *7.  <u>See also</u> <u>QB Distributors</u>, 999 F.Supp. at 1284 ("Given that the market for and utilization of these devices is hidden, if defendants are allowed to continue manufacturing and selling these products, there is no way Intermedia can protect itself from subscribers using these

products to pirate its services").  TWC's argument against defendants' sale and distribution of hacked modems and related software products is clearly analogous.

Finally, in actions against sellers of theft devices used on cable systems, numerous other Federal courts have required only a bare minimum showing of irreparable harm.  See, e.g., QB Distributors, 999 F.Supp. at 1283 ("[T]he Court finds that Intermedia need only make a minimum showing or irreparable harm, because defendants have clearly violated § 553"); Freedom Electronics, 897 F.Supp. at 1460 ("Several federal courts have held that absence of justification for violation of clear statutory rights virtually eliminates the necessity of showing irreparable harm."); TKR Cable Co., 1996 WL 465508 at *10 ("where a Defendant shows no justification for continuing to violate Plaintiff's clear statutory rights, there is no reason to withhold preliminary relief even without a showing of the same quantum of 'irreparable' damages as would be required where Plaintiff's ultimate success was more doubtful").

### 3.      Causation of Harm to Defendants

The testing of the hacked modems sold to TWC's investigators and the downloads available on defendants' website demonstrated that they were designed for and capable of facilitating theft of plaintiff's HSD services.  Cheung Aff. ¶ 21.  At the same time, the hacked modems sold by defendants, as with all theft devices, have no legitimate retail market (see, Cheung Aff. ¶ 21, see e.g., Cablevision Sys. Corp. v. Muneyyirci, 876 F.Supp. 415, 418 (E.D.N.Y. 1994); consequently, they have no purpose other than to enable purchasers to steal HSD services.  Accordingly, the imposition of the proposed injunctive relief would not foreclose the defendants from engaging in legitimate conduct, but would only preclude them from committing further violations of federal criminal statutes.  See e.g., Storer Communications, 625 F.Supp. at 1203 ("The alleged illegal activities of the defendant are not worthy of any protection

…. Defendant has no vested right to earn money by violating the law …. Defendant will suffer no harm if an injunction is issued which simply requires them to obey the law."); see also QB Distributors, 999 F.Supp. at 1284; Freedom Electronics, 897 F.Supp. at 1460; Cox Cable Cleveland Area, 582 F.Supp. at 381.  The continued sale of these devices and distribution of downloads by defendants levels irreparable harm upon TWC's business integrity and revenues.

The only harm that defendants could possibly claim is the loss of a lucrative criminal enterprise.  Greenleaf Electronics, 2000 WL 715601 at *7.  Given the defendants' demonstrated propensity to engage in criminal conduct, a temporary restraining order and preliminary injunction are necessary to protect TWC during the pendency of this action.  A balancing of the hardships plainly demonstrates that TWC needs and is entitled to the relief it seeks herein. Accordingly, it is respectfully submitted that this Court should enjoin the defendants' manufacture, sale, modification and distribution of hacked modems.

### 4.      The Injunction Will Serve the Public Interest

It is clear that the relief sought by TWC will not be adverse to and indeed will further the public interest in several ways.  First, the fact that defendants are violating federal statutes that specifically provide for injunctive relief – federal statutes that embody legislative determinations regarding public policy – standing alone, is sufficient to demonstrate that the relief sought by plaintiff will further the public interest.   Carrillo, 43 F.Supp.2d at 174 ("The Court finds that the illegal modification and/or distribution of cable television decoding devices with the intent that they be used for the unauthorized interception of programming services without payment of subscription fees constitutes conduct which is criminal in nature, and the public's interest in preventing such conduct is evident"); QB Distributors, 999 F.Supp. at 1284 (same).

Finally, the theft of HSD services made possible by defendants' hacked modems and related products undermines the intellectual property rights of the creators and owners of the programs that enable access to the HSD service, and the protected content on the Internet that is enjoyed without corresponding remuneration.  <u>TKR Cable Co.</u>, 1996 WL 465508 at *11; <u>Greenleaf Electronics</u>, 2000 WL 715601 at *7.  From the foregoing, it is clear that the Court's granting the injunctive relief sought by plaintiff will substantially promote the public interest.

## V.   TWC IS ENTITLED TO AN ORDER FREEZING DEFENDANTS' ASSETS DURING THE PENDANCY OF THIS ACTION, AND DEFENDANTS' ACCOUNTING

TWC seeks an injunction freezing defendants' assets connected to their DMCA violations at issue in this case in order to preserve its statutory right under 17 U.S.C. § 1201 and K.S.A. 60-3322 to an accounting of the proceeds and profits gained from defendants' illegal enterprise, and an award to it of actual damages and profits.  Plaintiff also seeks the asset freeze to preserve its right to the equitable remedy of constructive trust sought in the Complaint.

### A.   <u>An Asset Freeze is Necessary to Insure that Defendants Do Not Continue Their Illegal Cable Piracy Business</u>

TWC notes initially that in related cable theft cases, several circuits have held that a restraint on a defendant's transfers of assets is a legitimate exercise of a federal court's statutory injunctive power to prevent future statutory violations.  In <u>CSC Holdings, Inc. v. Redisi</u>, 309 F.3d 988, 996 (7th Cir. 2002), the Seventh Circuit upheld a restraint on a cable pirate's transfer of its assets, noting that the injunctive relief would help stop cable piracy, and would preserve the cable company's statutory equitable remedy of recovery of profits.  In <u>General Instrument Corp. v. Nu-Tek Electr.</u>, 197 F.3d 83 (3d Cir. 1999), the Third Circuit noted:

> The underlying fact is that Nu-Tek's business essentially facilitated cable theft in violation of § 553.  To stop such an operation is a primary purpose of the injunction.  It forecloses none of Nu-Tek's remaining business because, from the star, no identifiable legitimate business existed.  Likewise, I find that Nu-Tek

22

> should not be allowed to use its remaining assets which, in all likelihood can serve only to further other cable theft enterprises.  Nu-Tek has not asserted that the District Court's findings were clearly erroneous.  And it is readily apparent why, in light of such findings, the court would use broad language in the injunction.  Assets that could be used by a second entity to facilitate "further cable theft" must be carefully monitored . . . We see no abuse of discretion here and will uphold the District Court's denial of the motion to amend the injunction

Id. at 90-91.  See also TKR Cable Co., 267 F.3d at 208, fn. 4 (asset freeze or similar relief is appropriate where it will assist in preventing defendant from further violations of the Communications Act); Greenleaf Electr., 2000 WL 715601 at *8 (continuing asset restraint facilitates further equitable relief by making it more difficult for defendants to pick up and move enterprise to a new location).  In Tech Communications, 381 F.3d at 1315-17, the Eleventh Circuit followed this rule, specifically citing Redisi, TKR Cable, and Nu-Tek.  The DMCA provides identical relief.  See, 17 U.S.C. § 1203(c)(1)(A).  For the reasons set forth in these decisions, TWC submits that a freeze of defendants' assets is appropriate in this action to help prevent future violations of the DMCA, CFAA, and K.S.A. 60-3320 et. seq.

**B.      The Court has the Inherent Equitable Power to Order a Restraint on Asset Transfers in Order to Preserve the Status Quo**

Based on its inherent equitable power in conjunction with Fed.R.Civ.P. 65, this Court can issue a preliminary injunction freezing the defendants' assets.  Circuit and district courts have repeatedly approved the issuance of preliminary injunctions freezing a defendant's assets that are the subject of underlying litigation, or their direct and traceable proceeds, pending ultimate determination of the plaintiff's claims where, as here, equitable-type remedies are sought.  As indicated by the Tenth Circuit, "While it is true that the asset freeze has an effect comparable to that of an attachment, it is not an attachment.  The fact that the conditions for attachment, normally a remedy in actions at law, might not be met does not imply that another and equitable provisional remedy is not available."  Anthony v. Texaco, Inc., 803 F.2d 593, 1986 U.S.App.

LEXIS 32255 (10th Cir. 1986) (<u>citing</u>, <u>Federal Trade Commission v. H.N. Singer, Inc.</u>, 668 F.2d 1107, 1112 9th Cir. 1982); <u>Levi Strauss & Co.</u>, 51 F.3d at 987 (district court had authority to grant request for preliminary equitable relief, including an asset freeze, in order to assure the availability of permanent equitable relief in the form of an award of profits); <u>Reebok Intern., Ltd. V. Marnatech Enterprises, Inc.</u>, 970 F.2d 552, 559 (9th Cir. 1992) (a prejudgment asset freeze is an appropriate exercise of court's inherent equitable power to issue provisional remedies ancillary to its authority to provide final statutory equitable-type relief).  TWC seeks the identical relief, <u>i.e.</u>, a statutorily provided-for award of profits, herein.

The Supreme Court's decision in <u>Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.</u>, 527 U.S. 308, 119 S.Ct. 1961 (1999) similarly noted that, in a suit seeking equitable relief (such as the statutory accounting and profits remedies provided in 17 U.S.C. § 1203 (c)(2), and the constructive trust sought herein), a restraint on asset transfers was appropriate to preserve the status quo.  <u>Id</u>. at 1971-72.  <u>See</u> <u>also</u> <u>DeBeers Consol. Mines, Ltd. V. United States</u>, 325 U.S. 212, 220 (1945) ("[a] preliminary injunction is always appropriate to grand intermediate relief of the same character as that which may be granted finally"); <u>Redisi</u>, 309 F.3d at 996; <u>United States ex rel. Rahman v. Oncology Assos., P.C.</u>, 198 F.3d 489, 498 (4th Cir. 1999) (noting that when a creditor asserts a claim to specific assets, or seeks a remedy involving those assets, the court may invoke equity to preserve the status quo and further the court's ability to grant the final relief requested);  <u>Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills</u>, 321 F.3d 878, 884 n. 4 (9th Cir. 2003) (same).

**C.**      **An Asset Restraint is Necessary to Preserve Plaintiff's Right to an Accounting and Award of Profits from the Defendants**

As previously discussed, final relief under the DMCA and K.S.A. 60-3320, <u>et</u>. <u>seq</u>. includes an award to an aggrieved party of a defendant's profits gained from activity in violation

thereof.  As the affidavits submitted herein demonstrate, the defendants have been engaged in a covert hacked modem business in violation of federal criminal and civil statutes.  Accordingly, this Court should temporarily freeze defendants' assets pending assessment of their illegal gains. Numerous Federal courts have ordered an asset freeze against theft device sellers' business and personal assets in similar cable theft cases.  See Tech Communications, 381 F.3d at 1315-18 (affirming ex parte asset freeze); TKR Cable Co., 267 F.3d at 208, fn. 4 (affirming ex parte asset freeze as part of preliminary injunction pending defendants' demonstration that such assets are unrelated to cable television piracy business); Time Warner Cable of New York City v. M.D. Electronics, Inc., 101 F.3d 278, 279 (2d Cir. 1996) (referencing district court's ex parte ordering of asset restraint); Suppressed, 109 F.Supp.2d at 903-04 (ex parte asset freeze); Worldwide Elect., 50 F.Supp.2d at 1291 (affirming ex parte asset freeze as part of permanent injunction); QB Distributors, 999 F.Supp. at 1277-78 (ex parte asset freeze); U.S. Cable T.V., 920 F.Supp. at 324, 325 (ex parte ordering of seizure of illicit pirate decoder sales proceeds and ex parte seizure of funds tendered from one pirate decoder operator to another);

### D.   An Asset Restraint is Necessary to Preserve Plaintiff's Right to Constructive Trust Based Upon Unjust Enrichment and Conversion

In its Complaint, TWC asserted a constructive trust remedy for claims of unjust enrichment and conversion as defendants' profits represent revenues that would otherwise flow to TWC for monthly fees related to HSD services to which the defendants' illegal devices permit access.  TWC is also entitled, pursuant to 17 U.S.C. § 1203 (c)(2), to the disgorgement of defendants' criminal and illicit gains from their hacked modem sales and prohibited gains from property gained by illegal conduct in direct contravention of TWC's rights and thus held in constructive trust for its benefit.  Greenleaf Electronics, 2000 WL 715601 at *8.

CC 2291045v1

As the preliminary injunctive relief sought by TWC is directly related to defendants'
illegal conduct and is necessary to preserve its right to an accounting and the imposition of a
constructive trust, it is not subject to any applicable provisions of state attachment law.  "Simply
put the constructive trust, like its counterpart remedies 'at law,' is a remedy for unjust
enrichment."  Nelson v. Nelson, 288 Kan. 570; 205 P.3d 715 (Sup. Ct. Kan., 2009), Citing,
Restatement of Restitution: Quasi Contracts and Constructive Trusts, § 160 (1936).

In sum, as TWC sought a constructive trust remedy, and where the applicable statutes
provide for, inter alia, injunctions and an accounting, and where the assets sought to be restrained
are those primarily if not solely derived from illegal sales of cloned modems, this Court's
providing for the freeze of such assets is both procedurally appropriate and a practical necessity.

## VI.   PLAINTIFF MUST HAVE EXPEDITED DISCOVERY POWER TO AVOID IRREPARABLE INJURY

TWC has also moved for expedited discovery power pursuant to Fed.R.Civ.P. 30, 33, 34,
36 and 45.  Such expedited discovery will be granted upon a showing of:

> (1) irreparable injury, (2) some probability of success on the merits, (3) some
> connection between expedited discovery and the avoidance of irreparable injury,
> and (4) some evidence that the injury that will result without expedited discovery
> looms greater than the injury that the defendant will suffer if the expedited relief
> is granted.

Twentieth Century Fox Film Corp. v. Mow Trading Corp., 749 F.Supp. 473, 475 (S.D.N.Y.
1990); Computerland Corp. v. Batac, Inc., 1988 WL 140816 at *10 (S.D.N.Y. Dec. 16, 1988).

In the present case, TWC has demonstrated a likelihood of success on the merits.
However, it cannot readily determine the extent, amount, location or form in which defendants
have retained their business gains from this illegal activity.  Consequently, it requires expedited
disclosure and/or discovery to (i) obtain evidence regarding the merits; (ii) learn additional
information about the nature, volume and duration of the defendants' business and the harm

caused to TWC thereby; and (iii) identify and recover any assets defendants have transferred or

may transfer to frustrate the requested award of equitable remedies or judgment.  Moreover,

expedited discovery power will no pose substantial hardship to the defendants.  The information

that plaintiff seeks is not overly burdensome, and its irreparable injury in the absence of

expedited discovery is of far greater significance than any inconvenience to the defendants in

conducting their illegal business.

       In similar cases involving cable related theft, numerous Federal courts have granted such

expedited discovery.  In Freedom Electronics, the court stated the following:

> In this action, an accounting is absolutely necessary where, based upon the
> secretive and illicit nature of this criminal enterprise, the full volume and extent of
> defendants' sales to individuals and entities besides plaintiffs' investigators
> operation is presently unknown and without court intervention will remain
> unknown.

Id., 897 F.Supp. at 1460-61; see also QB Distributors, 999 F.Supp. at 1277-78 (granting

expedited discovery, including immediate inspection of defendants' business premises, on

ex parte basis); TKR Cable Co., 1996 WL 465508 at *4, *12 (ex parte order of expedited

discovery confirmed as part of preliminary injunction) see also Twentieth Century Fox, 749

F.Supp. at 475 (expedited discovery was necessary to locate defendant's assets and transferees of

merchandise, and "Inquiry into these areas on an expedited basis may very well lead to evidence

of continuing infringement by this defendant or others; it may also lead to the discovery of future

plans to infringe or the discovery of additional infringing merchandise.").[9]

In sum, unless TWC is granted expedited discovery and the immediate disclosure of other assets, the defendants may successfully conceal and dissipate assets, thereby rendering meaningless any award of equitable remedies or judgment this Court may enter.[10]

**VII.  TWC IS ENTITLED TO AN ORDER AUTHORIZING ENTRY UPON AND INSPECTION OF DEFENDANTS' PREMISES AND REVIEW OF BUSINESS RECORDS AND PIRATE DEVICES IN THEIR POSSESSION**

Pursuant to Fed.R.Civ.P. 64 and 65, and the Court's equitable powers, TWC seeks an order directing an ex parte seizure of defendants' business records, including those stored on computers or on computer hard drives, etc., that reflect any of defendants' business operations or finances.[11]  The seizure is sought at the location where defendants Theoryshare and Nicholas Aaron David work, the same address used by their business web site and at which their business receives shipments, as TWC's investigation demonstrated that defendants (i) use that location for receiving returns of hacked modems, and (ii) receive and store packages apparently containing cloned modems there; and (iii) use as a shipping address.  "Nick," of Theoryshare, has directly stated in this investigation that he held several hundred SB5101 cloned modems when the TWC investigator asked to buy five.  See Babcock Aff. ¶ 15.

In Vuitton v. White, 945 F.2d 569, 572-3 (3rd Cir. 1991), the Third Circuit cited a prior decision from the Second Circuit, i.e., In re Vuitton et Fils S.A., 606 F.2d 1 (2d Cir. 1979) as the classic precedent for a court to grant ex parte interim relief, including seizures of records and

---

[10]     In Suppressed, 109 F.Supp.2d at 903-05, the court authorized expedited discovery, but declined to enter provisions of proposed TRO requiring defendants' immediate disclosure of other business locations and provision of accounting of sales, profits, etc., believing that such affirmative commands might inhibit an individual cable piracy defendant's assertion of his or her privilege against self-incrimination.

[11]     Fed.R.Civ.P. 34 (a) provides, in pertinent part, that a party may serve on any other party a request to enter upon designated land or property to inspect, photograph, test or sample any designated object or operation on the property.

infringing devices, as an exercise of its equitable powers.  It has also observed that numerous

courts soon followed the Second Circuit's lead:

> Using the Vuitton case as authority, other courts began issuing--not just
> temporary restraining orders, which are frequently ignored--but seizure orders
> providing for the seizure of the counterfeit merchandise and related business
> records by the U.S. marshals or plaintiff's agent.

Id. 945 F.2d at 571-2.  The Third Circuit added the following, id. at 572:

> However, not all courts were persuaded of their authority to enter seizure orders
> even when they were persuaded that a plaintiff would be denied effective relief in
> the absence of such an order … After substantial study, Congress responded to
> these problems with the Trademark Counterfeiting Act of 1984.  That act
> provided criminal penalties for counterfeiting, mandatory triple damages, and
> specific authorization for injunctive relief, including ex parte seizure orders.

The relief sought by TWC has been approved by courts around the country.  AT&T

Broadband v. Tech Communications, 381 F.3d 1309 (11th Cir. 2004).  In Tech Communications,

the Eleventh Circuit upheld a district court's authority to direct an ex parte seizure even at the

defendant's residence where the piracy operation was conducted, and stated:  "[W]e conclude

that an ex parte search and seizure order directed at a defendant's residence, while certainly more

drastic than an ex parte asset freeze, is an appropriate equitable remedy to protect the

Congressional intent of the [Cable Communications Policy Act]."  Id. at 1319.  Indeed, the

issuance of an ex parte order authorizing a United States Marshal to seize and impound a hacked

modem operation's business records and stock of theft devices is a form of relief that is almost

identical and furthers Congressional intent under not only the DMCA but also the CFAA.  See

e.g., Redisi, 309 F.3d at 991 (noting district court's order directing seizure of business records

and computers); Mountain Cable Co. v. Choquette, 53 F.Supp.2d 107, 110-11 (D.Mass.1999) (ex

parte inspection of defendants' home ordered by court); Worldwide Electr., 50 F.Supp.2d at

1291 (ex parte seizure ordered); Carrillo I, 43 F.Supp.2d. at 170 (ex parte seizure ordered); U.S.

Cable T.V., 920 F.Supp. 321, 324-325 (E.D.N.Y. 1996) (court orders two ex parte seizures in two states within two months); Freedom Electr., 897 F.Supp. at 1458 (ex parte seizure ordered).

The immediate inspection of defendants' business location, seizure of their business records, and inventory of cloned modems, coupled with the preliminary injunction against future sales of cloned modems, is a practical means of ensuring the immediate cessation of their illegal conduct and preservation of evidence.

As the preceding makes clear that a district court has the inherent power to grant on an ex parte basis an inspection of business premises and seizure of all pirate devices and records, TWC submits that an ex parte order such relief herein must issue unless defendants are to be allowed a prior opportunity to conceal such items.

## CONCLUSION

On the basis of the foregoing, it is respectfully requested that the Court grant TWC's motion for a temporary restraining order, preliminary injunction, freeze of defendants' assets, accounting and expedited discovery, including expedited inspection of defendants' business premises, seizure of business records and computers and their inventory of cloned modems.

Respectfully submitted,

DANIEL J. LEFKOWITZ, ESQ., P.C.

By /s/Daniel J. Lefkowitz
    Daniel J. Lefkowitz–Pro Hac Vice Pending
    320 New York Avenue
    Huntington, New York 11743
    (631) 692-4700– Telephone
    (631) 659-3740 – Facsimile

By  /s/Bernard J. Rhodes
    Bernard J. Rhodes          KS #15716
    LATHROP & GAGE, LLP
    2345 Grand Blvd., Ste. 2400
    Kansas City, MO  64108
    (816) 292-2000 – Telephone
    (816) 292-2001 – Facsimile

Attorneys for Plaintiff